# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MISSOURI
# EASTERN DIVISION

TRISHA MAUCK,                        )
                                     )
    Plaintiff,               )
                                     )
    vs.                      )    **Case number 4:12cv0658 AGF**
                                     )                 **TCM**
CAROLYN W. COLVIN, Acting            )
Commissioner of Social Security,[1]  )
                                     )
    Defendant.               )

# REPORT AND RECOMMENDATION
# OF UNITED STATES MAGISTRATE JUDGE

This is an action under 42 U.S.C. § 405(g) for judicial review of the final decision of Carolyn W. Colvin, the Acting Commissioner of Social Security (Commissioner), denying the applications of Trisha Mauck for disability insurance benefits (DIB) under Title II of the Social Security Act (the Act), 42 U.S.C. § 401-433, and for supplemental security income (SSI), under Title XVI of the Act, 42 U.S.C. § 1381-1383b.

Ms. Mauck has filed a brief in support of her complaint; the Commissioner has filed a brief in support of her answer. The case was referred to the undersigned United States Magistrate Judge for a review and recommended disposition pursuant to 28 U.S.C. § 636(b).

---

[1]Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013, and is hereby substituted for Michael J. Astrue as defendant. See 42 U.S.C. § 405(g).

## Procedural History

Trisha Mauck (Plaintiff) applied for DIB and SSI in July 2009, alleging she had become disabled on March 22, 2005, by lumbar radiculopathy; spinal stenosis; spondylolisthesis at L5-S1; internal disc disruption; lower back pain; lumbar discogenic pain; lumbar facet arthropathy; post lumbar fusion; degenerative disc disease; fracture at L5; hypothyroidism; depression; and anxiety. (R.[2] at 123-34, 164.) Her applications were denied initially and following a hearing held in June 2010 before Administrative Law Judge (ALJ) Victor L. Horton. (Id. at 9-62, 69-74.) The Appeals Council denied Plaintiff's request for review, effectively adopting the ALJ's decision as the final decision of the Commissioner. (Id. at 2-4.)

## Testimony Before the ALJ

Plaintiff, represented by counsel; Aaron Mauck, her husband; and Delores E. Gonzalez, M.Ed., testified at the administrative hearing.

Plaintiff, thirty-two years old at the time of the hearing, testified that she lives in a one-story ranch house, is married, and has three children, ages twelve, eight, and two. (Id. at 27, 28.) The two older children are in school. (Id. at 27) They rent rooms in the house, which is owned by her mother-in-law. (Id. at 43.) The mother-in-law lives there and helps with the children and the housework. (Id. at 41-42.)

---

[2]References to "R." are to the administrative record filed by the Commissioner with her answer.

Plaintiff completed the twelfth grade.  (Id. at 28.)  She can read, do simple arithmetic, write, and use a computer.  (Id. at 28-29.)  She is right-handed, 5 feet 2 inches tall, and weighs 189 pounds.  (Id. at 28.)  Her husband works as a computer technician.  (Id. at 29-30.)  Her mother-in-law also works.  (Id. at 42.)

Plaintiff last worked in March 2005.  (Id. at 30.)  Her job then was as a registrar for a hospital.  (Id.)  She had been at that job since 2001.  (Id.)  She had also worked as a cashier for approximately a year and, before that, did clerical billing.  (Id. at 31.)  She had worked as a blackjack dealer, a dispatcher, and a custodian.  (Id. at 32-33.)

Plaintiff further testified that she had back surgery in February 2009.  (Id. at 34.)  Before the surgery, during which two discs were fused, she had had injections.  (Id. at 34-35.)  For a short period of time, she had used a transcutaneous electrical nerve stimulation (TENS) unit.  (Id. at 35.)  It did not help.  (Id.)  Both the TENS unit and the injections were tried before the surgery.  (Id. at 34, 35.)  She has continued to have constant pain since the surgery.  (Id. at 40.)  The pain is worse with any activity.  (Id.)  On a normal day, the pain is a six on a ten-point scale, with ten being severe pain.  (Id.)  Asked how she had injured her back, Plaintiff explained that her degenerative disc disease had been aggravated one night when she bent at the waist to pick up her forty-pound daughter as the daughter lay asleep on the floor.  (Id. at 35.)

In addition to her back pain, Plaintiff has pain that shoots down her leg and pain in her pubic bone region.  (Id. at 36.)  She takes medication every four hours that makes the pain

bearable.  (Id.)  Once or twice a day, the medication makes her tired, drowsy, and dizzy.  (Id. at 36, 41.)  The medication also adversely affects her ability to concentrate.  (Id.)

Plaintiff has a driver's license, but seldom drives.  (Id. at 37.)  She does "[v]ery little housework" and no cooking, with the exception of using the microwave.  (Id.)  With help, she does one load of laundry a week.  (Id.)  She does no yard work, and has no hobbies.  (Id. at 38.)  When she goes to the grocery store – once every one to two months – someone accompanies her.  (Id.)

Plaintiff can walk or stand for no longer than twenty minutes and sit for no longer than thirty minutes.  (Id. at 39-40.)  She cannot lift anything.  (Id. at 40.)

Mr. Mauck testified that their youngest child stays at home while he and his mother are at work and the two older children are in school.  (Id. at 45.)  The two-year old is still in diapers.  (Id.)  Mr. Mauck usually does the cooking, and he and his children do the vacuuming and mopping.  (Id. at 46.)

Asked to characterize the difference in Plaintiff before and after she injured her back, he testified that the pain was debilitating at first, causing emergency room trips for pain medication.  (Id. at 48.)  Now, she does not get out.  (Id.)  Her condition has been an emotional strain on the whole family.  (Id.)

Ms. Gonzalez testified without objection as a vocational expert (VE).  (Id. at 50.)  She characterized Plaintiff's past work as a blackjack dealer, a retail cashier in an office, and a customer service representative as light, semi-skilled; as a janitor as heavy, unskilled; and as a billing clerk, a dispatcher, and a registrar as sedentary, semi-skilled.  (Id. at 50-51)

She was then asked by the ALJ to assume a hypothetical claimant of Plaintiff's age, education, training, and work experience who was limited to light work with additional restrictions of (i) only occasionally stooping, kneeling, crouching, and climbing stairs and ramps; (ii) never climbing ropes, ladders, and scaffolds; and (iii) avoiding concentrated exposure to extreme cold and vibrations. (Id. at 51.) In reply to his question whether this hypothetical claimant could perform Plaintiff's past relevant work, the VE explained that she could do all but the janitor work. (Id.)

If this hypothetical claimant required a sit/stand option with the ability to frequently change positions, she could still perform Plaintiff's past relevant work as a customer service representative, cashier, and dispatcher. (Id. at 51-52.) Each of these three jobs existed in significant numbers in the local, state, and national economies. (Id. at 53-54.)

If this hypothetical claimant was limited to sedentary work, she could perform Plaintiff's past relevant work as a dispatcher and registrar. (Id. at 54.)

If, due to fatigue and pain, this hypothetical claimant also needed two breaks in addition to the normal two breaks, there were no jobs this claimant could perform. (Id. at 54.) If the second hypothetical claimant was limited to lifting less than twenty pounds, the only job remaining would be the dispatcher job. (Id. at 55.) If this claimant could not maintain pace and stay on task for eighty percent of the time or if she would miss three or more days of work a month, competitive employment would be precluded. (Id. at 55-56.)

The VE stated that her testimony was consistent with the *Dictionary of Occupational Titles* (DOT) except when she had explained any inconsistencies. (Id. at 56.)

## Medical and Other Records Before the ALJ

The documentary record before the ALJ included forms completed as part of the application process, documents generated pursuant to Plaintiff's applications, records from health care providers, and various assessments of her physical or mental capabilities.

When applying for DIB and SSI, Plaintiff completed a Disability Report. (Id. at 163-73.) She was then 5 feet 2 inches tall and weighed 175 pounds. (Id. at 163.) Her impairments, see page two, supra, limit her ability to work by (i) causing her pain that prevents her from standing longer than fifteen minutes or sitting longer than thirty minutes and (ii) weakening her legs. (Id. at 164.) These impairments first bothered her in May 2005 and prevented her from working the same time. (Id.) Her medications make her lethargic and dizzy. (Id.) The job she had held the longest was as a registrar for a hospital. (Id. at 165.)

Asked to describe on a Function Report what she does during the day, Plaintiff did so in terms of the severity of pain she experiences. (Id. at 174, 184.) On a "good pain day," which occurs one or two days a week, she showers, makes telephone calls, sometimes drives a short distance by herself, and sleeps well. (Id. at 184.) On "an average pain day," which occurs two or three days a week, she gets out of bed, sits on the couch, showers or takes a bath, and, possibly, leaves the house. (Id. at 174.) On "a bad pain day," which occurs two or three days a week, she gets out of bed, uses the bathroom, lies on the couch, and gets a drink or a snack from the kitchen. (Id.) On "a severe pain day," which occurs approximately two days a week, she stays in bed and, possibly, lies on the couch. (Id.) On her worst days, she does not sleep well. (Id. at 184.) Before her illnesses, she was able to work at the

hospital, constantly exercise, take her children shopping and to activities, cook, go dancing, be sociable, attend church, do yard work, and sit at a desk and use a computer. (Id. at 175, 176, 178, 179, 181.) Because of her impairments, she has difficulties getting dressed, bathing, and washing her hair. (Id. at 175.) Her husband reminds her at night to take her medications. (Id. at 176.) He also cooks the meals and does the shopping. (Id. at 176, 177.) Because of her pain, depression, and sleep difficulties, her relationships with others are strained. (Id. at 179.) And, her impairments adversely affect her abilities to lift, squat, bend, stand, reach, walk, sit, kneel, climb stairs, complete tasks, concentrate, and get along with others. (Id.) She cannot lift much weight due to her pain. (Id.) She can not walk longer than ten minutes before having to rest for at least five minutes. (Id.) Her ability to pay attention and complete a task depends on her pain level. (Id.) She can usually follow instructions unless she has not slept well. (Id.) She does not handle stress or changes in routine well. (Id. at 180.) She uses a walker when her pain is severe. (Id. at 180, 181.)

On a Work History Report, Plaintiff listed her job as a registrar as the longest job she has held.[3] (Id. at 185-96.) This job was held for approximately four years and four months. (Id.) She had worked as a cashier for nine months and as a "cash office associate" for fifteen months. (Id. at 153, 187.)

_____

[3]Plaintiff declined to give any information about the exertional requirements of the various jobs she had held, referring instead to her 2007 application. (See Id. at 186-89, 191-92.) With the exception of her jobs as a cashier and "cash office associate," however, she did not list the exertional requirements of her various jobs in the 2007 application either. (See Id. at 152-59.)

Plaintiff had reportable earnings in 1997 and 1999 to mid-2005, inclusive. (Id. at 139, 148.) Her highest annual earnings in these eight years were $9,721,[4] in 2000. (Id.) In only one other year, 1999, did her annual earnings exceed $5,000. (Id.) And, in these eight years, Plaintiff worked for six different employers, including working for four years for the hospital where she was last employed. (Id. at 140-42.)

Plaintiff completed a Disability Report – Appeal form after the initial denial of her applications. (Id. at 200-06.) As of approximately August 2009, her depression, anxiety, and insomnia had each significantly increased, negatively affecting her ability to cope with her pain and to care for herself, family, and friends. (Id. at 201.)

The relevant medical records[5] before the ALJ are summarized below in chronological order and begin with the March 23, 2005, record of Cindy Chu, M.D., of Plaintiff's visit for complaints of pain in her lower back, right hip, and right leg that had begun the day before. (Id. at 356-57.) She had had back pain in the past; however, this was severe, sharp, burning pain. (Id. at 356.) In the past, she had taken Motrin for pain relief, but she could no longer take it because of her gastric bypass surgery the previous June. (Id.) Also, her legs felt weak, the right leg more than the left. (Id.) She felt muscle spasms in her hip. (Id.) Plaintiff was given an injection of Toradol, an anti-inflammatory, and a prescription for Darvocet.[6] (Id.)

---

[4]All amounts are rounded to the nearest dollar.

[5]Accordingly, records relating to such complaints as strep throat, pregnancy-related issues, and bronchitis are not summarized.

[6]Darvocet is a combination of acetaminophen and propoxyphene, a narcotic pain reliever. See Darvocet, http://www.drugs.com/search.php?searchterm=darvocet (last visited May 22, 2013). It was withdrawn from the United States market in November 2010. Id.

She was to be off work for one week.  (Id.)  She was given additional Toradol injections on March 25, March 28, and March 30.  (Id. at 354, 355.)

Also on March 28, Plaintiff went to the emergency room at Crossroads Regional Medical Center (Crossroads) with complaints of low back pain that was a ten on a ten-point scale  (Id. at 211-19.)  The pain had begun two weeks earlier and was aggravated by walking.  (Id. at 216.)  The admitting diagnosis was acute sciatica.  (Id. at 211.)  A magnetic resonance imaging (MRI) of her lumbar spine revealed a small left paracentral and central disc herniation at L5-S1 and a small central disc protrusion at L4-L5; each herniation had a mild flattening of the ventral thecal sac, but no significant spinal stenosis and no foraminal narrowing.  (Id. at 212-13, 1086-87, 1285-86, 1317-18, 1394-95.)  She was treated with Demerol[7] and Toradol.[8]  (Id. at 217-19.)  On discharge two hours later, Plaintiff's pain level was a zero.  (Id. at 214, 216.)  She was instructed to avoid excessive bending or lifting and to take her already-prescribed medication.  (Id. at 217.)

After the last Toradol injection, Plaintiff called Dr. Chu to request a referral to physical therapy because the pain was unbearable.  (Id. at 359.)  She was given authorization for physical therapy three times a week for four weeks.  (Id.)  Subsequently, she was evaluated at SSM Rehab prior to beginning physical therapy there and assessed as having acute low back pain, sciatica, and a protruding disc at L5-S1.  (Id. at 221-23, 228, 239-42.)

_____

[7]Demerol is an opioid pain reliever similar to morphine, and is prescribed for the treatment of moderate to severe pain.  See Demerol, http://www.drugs.com/search.php?searchterm=demerol (last visited May 22, 2013).

[8]The name of a third medication is illegible.

After five sessions, the therapist wrote Dr. Chu that Plaintiff rated her pain as a three to five on a ten-point scale, reported that she was "still unable to participate in many of her leisure activities," and was having difficulties with her activities of daily living.  (<u>Id.</u> at 229.)  The therapist requested that additional visits be prescribed.  (<u>Id.</u>)  Plaintiff had additional physical therapy sessions on April 4, April 6, April 14, and April 19.  (<u>Id.</u> at 224-27.)  At this last session, Plaintiff was doing well until she flexed forward, at which time her symptoms began again.  (<u>Id.</u> at 227.)

While participating in physical therapy, Plaintiff telephoned Dr. Chu to request a refill of a prescription for Vicodin,[9] but at an increased dosage.  (<u>Id.</u> at 360.)  Plaintiff explained that her pain was returning four hours after she took the medication.  (<u>Id.</u>)

On April 5, while participating in physical therapy sessions, Plaintiff consulted Suresh Krishnan, M.D., about her low back pain.  (<u>Id.</u> at 266-74.)  She reported that it had begun on March 22 of that year when she bent to lift a sleeping child off the floor.  (<u>Id.</u> at 266, 270.)  The pain started on the right side of the hip and radiated down the hip.  (<u>Id.</u>)  The pain became worse after she returned to work; it then began to radiate down the right leg.  (<u>Id.</u>)  On March 26, the pain began radiating down the left leg.  (<u>Id.</u>)  Toradol injections had helped only on the day they were administered.  (<u>Id.</u>)  She had also been given a steroid injection, which had decreased the weakness she had been experiencing in her legs.  (<u>Id.</u> at 266.)  Currently, her pain was concentrated in the left side of the hip, was increased by standing and

---

[9]Vicodin is a combination of hydrocodone, an opioid analgesic, and acetaminophen. <u>Physicians' Desk Reference</u>, 573 (65th ed. 2011) (<u>PDR</u>).  It is prescribed for the relief of moderate to moderately severe pain.  <u>Id.</u>

sitting, and was decreased by lying down. (Id. at 266, 270.) She walked with an antalgic gait favoring the left leg. (Id. at 266, 271.) She could not complete straight leg raises tests[10] due to the pain. (Id. at 266.) She had a reduced range of motion in her hips and knees. (Id. at 271.) Dr. Krishnan's diagnosis was left piriformis muscle[11] syndrome. (Id. at 267.) He injected her left piriformis muscle with a local anesthesia and steroid. (Id. at 267, 272.) Plaintiff was then able to walk without a limp. (Id. at 274.) Her pain decreased to a three on a ten-point scale. (Id.) The injection was to be followed by three Botox injections. (Id. at 267, 268.)

Three days later, Plaintiff, walking with a right-sided limp, was given an injection in her right piriformis muscle. (Id. at 262-65.) The diagnosis was bilateral piriformis syndrome. (Id.) Another injection was given the following week, and a third on May 18. (Id. at 224-26, 247-54, 260-61.)

On May 26, Plaintiff telephoned Dr. Chu for a refill of her Vicodin; one was given. (Id. at 364.)

Plaintiff consulted Dr. Chu on June 1 for complaints of low back pain, reporting that the pain had been less with physical therapy and pain management until gradually worsening

---

[10]"During a [straight leg raising] test a patient sits or lies on the examining table and the examiner attempts to elicit, or reproduce, physical findings to verify the patient's reports of back pain by raising the patient's legs when the knees are fully extended." **Willcox v. Liberty Life Assur. Co. of Boston**, 552 F.3d 693, 697 (8th Cir. 2009) (internal quotations omitted).

[11]"The piriformis muscle is a flat, band-like muscle located in the buttocks near the top of the hip joint," "is important in lower body movement," and "enables a person to maintain balance." Piriformis Syndrome, http://www.webmd.com/pain-management/guide/piriformis-syndrome (last visited May 22, 2013).

during the past month.  (Id. at 297-99, 365-66.)  Due to the steroid injections, her nerve pain was better.  (Id.)  She was still having some muscle spasms.  (Id.)  Her medications included Vicodin and Synthroid.[12]  (Id.)  On examination, she was not in acute distress and was pleasant.  (Id.)  Straight leg raises were negative.  (Id.)  She was to start talking Elavil for her back pain in addition to the Vicodin.  (Id.)  She was to follow up as needed.  (Id.)

Plaintiff again saw Dr. Chu on August 17.  (Id. at 295-96, 70-71.)  She reported having felt "much better" in June and July.  (Id. at 295.)  Her pain was beginning to increase, although she could not recall any trauma or lifting anything heavy.  (Id.)  When her pain was better, she was taking Vicodin a few times a week; currently, she was taking it every three to four hours.  (Id.)  She was started on Naprosyn, a nonsteroidal anti-inflammatory,[13] and Flexeril[14] in addition to the Vicodin.  (Id. at 296.)  As before, she was to return as needed. (Id.)

The next month, on September 7, Plaintiff telephoned Dr. Chu to request a refill of her Vicodin due to pain in her left foot, hip, and spine.  (Id. at 372.)  A check with the pharmacy revealed that Plaintiff had had a refill on August 17.  (Id.)  Plaintiff was given a refill and cautioned that she must try to decrease her use of the drug.  (Id.)  Dr. Chu opined that Plaintiff was "probably addicted by now."  (Id.)

---

[12]Synthroid is prescribed for the treatment of hypothyroidism.  PDR at 543.

[13]See Naprosyn, http://www.drugs.com/search.php?searchterm=naprosyn (last visited May 22, 2013).

[14]Flexeril (cyclobenzaprine) is a muscle relaxant.  Flexeril, http://www.drugs.com/search.php?searchterm=flexeril (last visited May 22, 2013).

Two weeks later, Plaintiff telephoned Dr. Chu's office to inquire about the status of a note she had requested a week earlier to be off work and about a refill of her Naprosyn prescription.  (<u>Id.</u> at 373.)  Dr. Chu replied that she would give Plaintiff the note, but would not do so in the future without seeing her because she did not know why Plaintiff had taken off work.  (<u>Id.</u>)  An MRI taken the next day of Plaintiff's lumbar spine showed no interval changes since her previous MRI.  (<u>Id.</u> at 1084-85, 1262-63, 1314-15, 1391-92.)  Plaintiff telephoned Dr. Chu a few days later, stating that she had seen her MRI and it did reflect changes since the previous one.  (<u>Id.</u> at 374.)  Dr. Chu saw no changes.  (<u>Id.</u>)

On September 23, in response to a request by Plaintiff for a refill of hydrocodone, Dr. Chu noted that she had had a refill on September 6 and that her use of the medication was increasing.  (<u>Id.</u> at 375.)

The following month, on October 6, Plaintiff consulted John P. Metzler, M.D., as a new patient.  (<u>Id.</u> at 328-30, 1082-83.)  On examination, she was alert, cooperative, and in no acute distress.  (<u>Id.</u> at 329.)  She had pain with lumbar flexion, which was reduced by at least twenty percent, and with extension.  (<u>Id.</u>)  She had full strength with dorsiflexion, bilateral knee extension, and hip flexion.  (<u>Id.</u>)  She had back and leg pain with straight leg raises.  (<u>Id.</u>)  Babinski's sign was absent.[15]  (<u>Id.</u>)  Dr. Metzler's diagnosis was L4-L5 and L5-S1 degenerative disc disease with central disc bulge and low back and bilateral leg pain.  (<u>Id.</u>)

---

[15]A Babinski sign is present if the big toe goes up when the sole of the foot is stimulated. <u>Definition of Babinski sign</u>, <u>http://www.medterms.com/script/main/art.asp?articlekey=7186</u> (last visited May 22, 2013).  A present sign indicates a problem in the central nervous system.  <u>Id.</u>

The next week, Dr. Metzler administered Plaintiff a transforaminal epidural steroid injection for treatment of her right and left-sided radiculopathy at L5-S1. (<u>Id.</u> at 287-88, 327, 1075-76.) Another injection was given on November 17, January 5, 2006, and May 18. (<u>Id.</u> at 285-86, 289, 291-92, 321-26, 344-47, 1049, 1063, 1069.)

A May 23, 2006, MRI of Plaintiff's lumbar spine revealed minimal to mild generalized disc bulging at L3-L4, L4-L5, and L5-S1 without canal stenosis or neuroforaminal stenosis and annular fissure formations at L4-L5 and L5-S1. (<u>Id.</u> at 293, 342, 348-49, 1264, 1316, 1393.)

Two days later, Plaintiff again saw Dr. Metzler after she had called and reported continued pain at her injection site. (<u>Id.</u> at 319-20.) Dr. Metzler detected a small hematoma at the site, but no infection. (<u>Id.</u> at 319.) She had negative straight leg raises. (<u>Id.</u>) After Plaintiff expressed interest in a surgical evaluation of her back pain, Dr. Metzler gave her the names of several surgeons with whom she could consult. (<u>Id.</u>)

Consequently, on July 18, Plaintiff consulted an orthopaedic surgeon, Jacob M. Buchowski, M.D. (<u>Id.</u> at 316-18, 331-36, 341.) She described worsening back and leg pain. (<u>Id.</u> at 316.) Of the leg pain, ninety percent was in her right leg; ten percent was in her left. (<u>Id.</u> at 316, 332.) Her right thigh, right calf, and left big toe were weak; her right thigh and calf and her left calf and foot were numb. (<u>Id.</u>) She could not stand or walk longer than fifteen to thirty minutes without pain. (<u>Id.</u>) She could not sit for longer than an hour. (<u>Id.</u> at 336.) She reported that, five times in the past week, she had had low back pain, numbness or tingling in her legs or feet, and weakness in her legs or feet. (<u>Id.</u> at 335.) She had leg pain

six times during that period.  (Id.)  The intensity of the pain was severe, but sporadic.  (Id.)

She could dress herself, but only with significant pain.  (Id.)  She could lift only light objects.

(Id.)  Her sleep was interrupted half the time by pain.  (Id. at 336.)  Physical therapy,

massage, manipulation, anti-inflammatories, narcotics, epidural steroid injections, and trigger

point injections had provided little relief.  (Id. at 316, 332.)  On examination, Plaintiff had

4+/5 motor strength limited by pain.  (Id. at 317.)  Her reflexes were normal; straight leg

raises were negative.  (Id.)  Her spine flexion was "reasonably good"; however, extension was

limited by pain.  (Id.)  She "ha[d] severe low back pain with axial loading of her spine."  (Id.)

And, she had discomfort with simulated rotation of her spine and superficial palpation.  (Id.)

X-rays of her lumbar spine were "essentially unremarkable except for a pars defect of L5 and

very mild disc degeneration at L5-S1 and L4-L5."  (Id. at 317, 341.)  Dr. Buchowski favored

non-operative therapy and, if Plaintiff failed to improve, would consider fusing the discs at

L5-S1 or, possibly, from L4 to S1.  (Id. at 318.)

        In March 2007, Plaintiff had a transforaminal epidural steroid injection at S1.  (Id. at

290, 315, 350-51, 1030.)

        The following month, Dr. Metzler renewed her prescriptions for Skelaxin, a muscle

relaxant,[16] and naproxen, a non-steroidal inflammatory.[17]  (Id. at 851.)  The same day, she

received a prescription from Heidi Prather, D.O., for oxycodone with acetaminophen.  (Id.

_____

        [16]See PDR at 1732.

        [17]See PDR at 761.

at 852.) On April 16, Dr. Metzler prescribed hydrocodone acetaminophen for Plaintiff. (Id. at 853.) This prescription was renewed on May 2. (Id. at 854.)

A few weeks later, on May 30, after moving from Missouri to Nevada, Plaintiff consulted Alain Coppel, M.D., with the Centennial Spine and Pain Center in Las Vegas. (Id. at 382-91, 465-73, 496, 525-26, 580-89, 861-69, 1240-49, 1273, 1278, 1312-13, 1381-90, 1597.) Her chief complaint was of low back pain radiating to her right hip and leg. (Id. at 382.) She had developed the pain in 2005. (Id.) The pain constantly radiated down her right leg and, occasionally, down her left. (Id.) The pain varied between a five and nine on a ten-point scale; currently, it was a seven. (Id.) It was aggravated by standing, walking, and driving and alleviated by medication, rest, ice, and "the spa." (Id.) She was taking Lortab,[18] Skelaxin, and naproxen, which, in combination, gave her ten percent pain relief and increased her quality of life. (Id. at 383.) Her history included "[s]light depression secondary to pain." (Id.) She was in the process of applying for SSI. (Id.) Because of her pain, she could only sit for sixty minutes, stand or ride in a car for twenty minutes, and walk fifty feet. (Id. at 385.) On a scale from one to ten, with ten being completely interfering, the pain adversely affected her general activity, ability to concentrate, and enjoyment of life at an eight; her walking ability, relations with other people, and sleep at a six; her mood at a nine; and her normal work routine at a ten. (Id. at 385-86.) On examination, her stance and gait were normal and she could toe and heel walk. (Id. at 388.) She could flex to ninety degrees. (Id.) She could extend, bend laterally to either side, and rotate to either side to thirty degrees. (Id.)

---

[18]Lortab is a combination of acetaminophen and hydrocodone. Lortab, http://www.drugs.com/search.php?searchterm=lortab (last visited May 22, 2013).

Straight leg raises were positive bilaterally.  (Id.)  The Fabere's sign, or Patrick's sign, was present bilaterally.[19]  (Id.)  Dr. Coppel's diagnosis was of lumbar disc degeneration and displacement, lumbar facet arthropathy,[20] and lumbar radiculopathy.  (Id. at 389.)  Her prescription for Lortab was changed to Percocet, a combination of oxycodone and acetaminophen.[21]  (Id.)  She was also started on a Fentanyl patch.[22]  (Id.)  No physical therapy, further imaging or diagnostic studies, or psychological counseling was necessary. (Id. at 389-90.)  She was to return in four weeks or sooner if needed.  (Id. at 390.)

Plaintiff returned in three weeks, on June 21, complaining of low back and right leg and hip pain that was currently a four to six on a ten-point scale.  (Id. at 461-64, 491, 495, 523-24, 576-79, 870-73, 1099-102, 1236-38, 1272, 1277, 1310-11, 1377-80.)  She had recently found out she was pregnant, and was to check with her perinatologist about medications that were safe to use during her pregnancy.  (Id. at 461.)  Under "employment," she was listed as "disabled."  (Id.)

---

[19]A positive Patrick's sign indicates the presence of sacroiliac joint dysfunction in patients with lower back pain.  Patrick's Test: Evaluation of Sacroiliac Joint Dysfunction, http://stemcelldoc.wordpress.com/2009/03/30/patricks-test-evaluation-of-sacroiliac-joint-dysfuncti on/test (last visited May 8, 2013).  It is also referred to as the Fabere sign.  See Dorland's Illustrated Medical Dictionary, 1896 (32nd ed. 2012) (Dorland's).  The word "Fabere" is derived from "the initial letters of the movements necessary to elicit [the sign]:  flexion, abduction, external rotation, extension."  Id.

[20]Arthopathy is "[a]ny disease affecting a joint."  Stedman's Medical Dictionary, 150 (26th ed. 1995).

[21]See PDR at 1096.

[22]Fentanyl is an opioid.  PDR at 2403.  Fentanyl patches are only to "be used in patients who are already receiving opioid therapy" and are for "the management of permanent, moderate to severe chronic pain."  Id. at 2403, 2405.

- 17 -

On June 28, Plaintiff returned to Dr. Coppel's office, reporting that her pain was occasionally also radiating down her left leg.  (Id. at 457-60, 490, 494, 521-22, 573-75, 701, 876-79, 1103-06, 1232-35, 1271, 1275, 1308-09, 1374-76, 1518.)   Her medications – approved by her obstetrician for use during her pregnancy – included Fentanyl patches, Percocet, and Pamelor.[23]  (Id. at 458, 875)  Her diagnosis was unchanged.  (Id. at 458.)

Plaintiff obtained refills of her medications on July 15, August 21, September 18, October 18, November 15, and December 13.  (Id. at 474-85.)

Between her July and August refills, Plaintiff consulted an internist, Arezo Maria Fathie, M.D.  (Id. at 794-95.)  She was tearful, complained of back pain, and reported she was unable to lift her baby.  (Id.)  She wanted an increase in the dosage of her Fentanyl patches and a prescription for Neurontin.[24]  (Id. at 794-95.)

Ten days after her July refill, on referral from Dr. Coppel, Plaintiff consulted David Lanzkowsky, M.D., also with the Centennial Spine and Pain Center, for evaluation of her lumbar radiculopathy.  (Id. at 413-14, 418-21, 641, 647, 653, 712-13, 880-86, 1107-13, 1186-87, 1191-96, 1258-59.)  She described her pain as an aching, numbing, burning, and stabbing pain.  (Id. at 881.)  It was aggravated by running, jumping, dancing, and walking.  (Id. at 882.)  Her pain prevented her from sitting for longer than sixty minutes, standing or riding in a car for longer than twenty minutes, and walking farther than fifty feet.  (Id.)  She rated

---

[23]Pamelor, nortriptyline, is a antidepressant.  See Pamelor, http://www.drugs.com/search.php?searchterm=pamelor (last visited May 22, 2103).

[24]Neurontin (gabapentin) is prescribed for "a range of neuropathic pain conditions."  See Neurontin (gabapentin), http://www.medilexicon.com/drugs/neurontin_783.php (last visited May 22, 2013).

the affect of her pain on various daily activities just as she had when she saw Dr. Coppel. (Id. at 882-83.)  Her current medications included Fentanyl patches, Pamelor, Percocet, and Seriokot (for constipation).  (Id. at 884.)  She could flex to forty degrees, rotate to either side to thirty-five degrees, and extend and laterally bend to either side to thirty degrees.  (Id. at 885.)  Straight leg raises were negative bilaterally; and Fabere signs were absent bilaterally. (Id.)  Waddell's signs were also absent.[25]  (Id.)  Dr. Lanzkowsky's diagnosis was of lumbar radiculopathy, lumbar enthesopathy,[26] and lumbar facet arthropathy.  (Id. at 885-86.)  He prescribed Duragesic (Fentanyl) patches, nortriptyline, and Percocet.  (Id. at 886.)  Also, she was referred for physical therapy, with three sessions a week for four weeks.  (Id. at 414, 486.)  Plaintiff was to return in four weeks or, if necessary, sooner.  (Id. at 886.)

Plaintiff saw Dr. Lanzkowsky in August for her one month follow-up visit.  (Id. at 412, 417, 646, 652, 710-11, 889-91, 1114-16, 1185, 1190, 1256-57.)  Plaintiff, then fourteen weeks pregnant, reported that she was able to perform her daily living activities.  (Id. at 889.)  She was alert and oriented and had a good affect and a mildly antalgic gait.  (Id. at 890.)  Her prescriptions were renewed; she was to return in one month.  (Id.)

Plaintiff did return, reporting that her pain was an eight on a ten-point scale and radiated from her lower back to her buttocks and lower extremities.  (Id. at 410, 416, 644,

---

[25]"Waddell signs are a group of 8 physical findings, . . . the presence of which has been alleged at times to indicate the presence of secondary gain and malingering."  Fishbain, DA, et al., Is there a relationship between nonrganic physical findings (Waddell signs) and secondary gain/malingering?, http://www.ncbi.nlm.nih.gov/pubmed/15502683 (last visited May 22, 2013).

[26]Enthesopathy is "[a] disease process occurring at the site of insertion of muscle tendons and ligaments into bones or joint capsules."  Stedman's at 578.

651, 708-09, 892-94, 1117-19, 1183, 1189, 1254-55.)  On examination, she was as before.  (Id. at 893.)  Her prescriptions were renewed.  (Id.)

At her October visit, the only change from previous visits was Dr. Lanzkowsky's instructions to Plaintiff to "change out of" her Fentanyl patch every two days.  (Id. at 409, 643, 706-07, 895-97, 1120-22, 1182, 1252-53.)  Her complaints and prescriptions were unchanged at her monthly visits in November, December, January 2008,  and February.  (Id. at 408, 415, 424, 702-05, 898-908, 1123-34, 1181, 1188, 1250-51, 1260-61.)

When Plaintiff saw Dr. Lanzkowsky for her March visit, her pain level remained at an eight and straight leg raises were positive bilaterally.  (Id. at 744-45, 909-10, 1135-37.)  An MRI was to be conducted, and was on March 21, revealing mild bulging at L4-L5 and L5-S1; ligamentum flavum redundancy and facet arthropathy at L4-L5; and asymmetric fatty tissue at L3.  (Id. at 760-61, 910, 1442, 1577-78.)  It was then decided that Plaintiff would undergo a lumbar discography at L3-S1.  (Id. at 911-14, 1138-40.)  When Plaintiff saw Dr. Lanzkowsky for her monthly visits in April and May, she reported that she had yet to schedule the discography.  (Id. at 666, 740-41, 738-39, 915-20, 1141-46.)

The week after her June visit, Plaintiff had a lumbar discography at L3-S1.  (Id. at 538-43, 764-68, 922-23, 925-40, 1147-54.)  A computed tomography (CT) scan of her lumbar spine taken prior to the discogram revealed (a) bilateral pars interarticularis defect at L5; (b) a posterior disc bulge annular tear at L4-L5; (c) minimal ligamentum flavum hypertrophy and minimal disc bulge at L2-L3; and (d) a slight degenerative loss of disc height at L1-L2.  (Id. at 757, 831, 848, 1574-76.)  Dr. Lanzkowsky then performed a discogram with

radiographic interpretation at L3-4, L4-5, and L5-S1. (<u>Id.</u> at 826-30, 843-47, 925-40, 1150-54, 1337-44.) The discograms revealed a normal disc at L3-L4 and annular tears at L4-L5 and L5-S1. (<u>Id.</u> at 827-28.)

Plaintiff returned to Dr. Lanzkowsky in July, continuing to complain of pain that radiated from her low back to her legs. (<u>Id.</u> at 736-37, 942-44, 1155-57.) He thought she was a good candidate for a lumbar epidural injections. (<u>Id.</u> at 943.) She wished to proceed with the injections. (<u>Id.</u>)

At Plaintiff's monthly visits to Dr. Lanzkowsky in August, September, and October, there were no changes in pain or in his recommendation for injections. (<u>Id.</u> at 730-35, 945-47, 949-56, 1158-66.)

Between her August and September visits to Dr. Lanzkowsky, Plaintiff was, on his recommendation, evaluated by Daniel D. Lee, M.D., an orthopedist. (<u>Id.</u> at 756, 811, 824-25, 842, 1573.) Dr. Lee described the reason for the evaluation:

> This is a 30-year old who has failed all conservative management. She has a spondylolysis defect at L5 and severe low back pain. It is 70% in the low back and 30% in the right leg, worse than the left leg. It is worse with lying on her side and standing. It is better with lying on her back. She has 4 children. It is worse with child care. It is aches, pins and needles, numbness, burning and stabbing. She has had all lumbar results with physical therapy, no significant leg pain relief. She is on significant pain medications. She had discograms which showed a negative level at 3-4 and positive at 4-5 and 51.

(<u>Id.</u> at 756.) On examination, she was not in apparent distress, and was alert and oriented to time, place, and person. (<u>Id.</u>) She had a limited range of motion in her lumbar spine. Straight leg raises were "somewhat positive on the right and negative on the left." (<u>Id.</u>) Dr.

Lee's assessment was of spondylolysis[27] at L5 with significant degenerative back pain at L4-L5 and L5-S1 with radicular pain and lateral recess stenosis. (Id.) He requested that she have an MRI of her lumbar spine. (Id.) Also, he recommended that she not undergo lumbar decompression and fusion unless her back pain was "a major problem in her life." (Id.)

Five days after her October visit to Dr. Lanzkowsky, he administered Plaintiff transforaminal epidural steroid injections at right L4-L5, right L5-S1, left L4-L5, and left L5-S1. (Id. at 528-37, 762, 956-70, 1167-70, 1327-36.)

Plaintiff reported to Dr. Lanzkowsky at her November visit that she had had "little if any relief of her symptoms" after receiving the injections. (Id. at 728-29, 971-73, 1171-72.) Her level of pain, range of motion, and straight leg raises were as before. (Id. at 972-73.) She was to increase her level of activity as tolerable. (Id. at 973.)

When she next saw Dr. Lanzkowsky, in January 2009, for a monthly visit, Plaintiff's pain level was reported to be a nine to ten without medication. (Id. at 659, 724-25, 977-79, 1177-79.) Otherwise, her symptoms and abilities were as before. (Id. at 977-79.) There were no changes noted at her February visit. (Id. at 658, 722-23, 980-82, 1180.)

Six days after that visit, Dr. Fathie prescribed Cymbalta, an antidepressant,[28] for Plaintiff. (Id. at 790-91.)

---

[27]Spondylolysis is "the dissolution of a vertebra, a condition marked by platyspondylia ['a congenital flattening of the vertebral bodies'], aplasia ['a lack of development'] of the vertebral arch, and separation of the pars articularis." Dorland's at 116 (definition of aplasia), 1459 (definition of platyspondylia), and 1754 (definition of spondylolysis).

[28]See PDR at 1758.

Shortly after seeing Dr. Fathie, Plaintiff advised Dr. Lee that she wished to proceed with surgery. (Id. at 823, 841.) Three days later, on February 22, she underwent segmental instrumentation at L4 to S1 for three levels; posterolateral fusion at L4 to S1 for a total of two levels; removal of hardware at L5 with complete laminectomy at L5 and bilateral laminotomy at L3-4; and an iliac crest bone graft. (Id. at 804-09, 817-22, 835-40.) Dr. Lee's post-operative diagnosis was lumbar radiculopathy, spinal stenosis, spondylolisthesis[29] at L5-S1, internal disc disruption, and low back pain. (Id. at 808.) He prescribed her a walker to be used during her recovery. (Id. at 814.)

At a post-operative visit to Dr. Lee on March 5, she was described as doing well. (Id. at 816, 834.) She occasionally had some right lower extremity sciatica, but her leg and back pain was "much improved." (Id. at 816, 834.)

When he saw Plaintiff in March, Dr. Lanzkowsky prescribed her MS Contin (morphine[30]), MSIR (morphine sulfate immediate release), Neurontin, and nortriptyline. (Id. at 656, 718-19, 986-87.) She no longer had medical insurance and had requested that her prescriptions be changed accordingly. (Id. at 987.) At her April visit, her pain was reported to be a five to six. (Id. at 655, 716-17, 989-91.)

At her April visit to Dr. Lee, Plaintiff was doing well, her pain was "much improved." (Id. at 813, 833.) She was occasionally taking Lortab. (Id.) Three weeks later, on April 30,

_____

[29]Spondylolisthesis is the "[f]orward movement of the body of one of the lower lumbar vertebrae on the vertebra below it . . . ." Stedman's at 1656.

[30]See MS Contin, http://www.drugs.com/search.php?searchterm=MS+Contin (last visited May 23, 2013).

her pain was again described as "much improved." (Id. at 812, 832.) She was to wean off her medication. (Id.) It was noted that she was to move to Saint Louis. (Id.)

In May, Plaintiff saw Dr. Coppel. (Id. at 654, 714-15, 992-94.) Plaintiff continued to complain of pain in her lower back that radiated to her lower extremities with associated numbness. (Id. at 993.) She further reported "that her symptoms [were] fairly well controlled with her current medication regimen." (Id.) Her activity level and sleep had both improved. (Id.) She was moving out-of-state the next week. (Id.)

Having returned to the St. Louis area, Plaintiff also returned to Dr. Metzler on June 22. (Id. at 857-58, 1021-22.) He noted that he had not seen her since 2007. (Id. at 857.) She reported that her back pain and leg symptoms had improved, but had not completely resolved. (Id.) On examination, she had pain with attempts at lumbar flexion, weakness with bilateral great toe extension, and full strength with bilateral knee and hip flexion and with bilateral dorsiflexion. (Id.) Her current medications included MS Contin, MSIR, Neurontin, nortriptyline, and Soma, a muscle relaxer.[31] (Id.) She was continued on these medications and was to follow-up with a spine surgeon for evaluation of the status of her spinal fusion. (Id. at 858.)

In September, Plaintiff consulted Sean McIntosh, D.O., about her hypothyroidism after running out of her medication three weeks earlier. (Id. at 1603-06.) Dr. McIntosh noted that Plaintiff was seeing Dr. Metzler for pain management. (Id. at 1604.) He also noted that her extremities appeared normal and that she was alert and oriented and did not display any

_____

[31] See Soma, http://www.drugs.com/search.php?searchterm=soma (last visited May 23, 2013).

unusual anxiety or evidence of depression.  (Id.)  Her thyroid secreting hormone (TSH) levels were checked.  (Id. at 1605.)  She was restarted on Synthroid.  (Id.)

The following month, Plaintiff complained to Dr. Metzler of continuing back pain and of numbness and tingling extending into her legs.  (Id. at 1019-20.)  She had trouble sleeping.  (Id. at 1019.)  She requested, and was given, an increase in her dosage of nortriptyline.  (Id.)  Her other medications, including the MS Contin, MSIR, Neurontin, and Soma were renewed.  (Id.)  An examination was deferred.  (Id.)

In February 2010, she complained to Dr. Metzler of chronic low back pain radiating to both legs.  (Id. at 1017-18.)  She could not stand for any length of time, had trouble with prolonged sitting, and had to frequently change positions.  (Id. at 1017.)  On examination, she was alert and cooperative.  (Id.)  She had full lower extremity strength and pain with lumbar flexion.  (Id.)  She was applying for disability.  (Id.)

Plaintiff saw Dr. McIntosh in June 2010 for a refill of her thyroid medication.  (Id. at 1600-02.)

Also before the ALJ were various assessments of the causes of Plaintiff's impairments and their resulting limitations.

Dr. Coppel wrote "To Whom It May Concern":[32]

[Plaintiff has been a patient of mine since 5/30/07.  [She] has a diagnosis of chronic low back pain that radiates into both legs.  She suffers from the

---

[32]The ALJ and the Commissioner refer to this letter as having a report date of August 18, 2009.  All 135 pages in the exhibit that include the letter are dated August 18, 2009.  The letter is filed between Dr. Coppel's notes of Plaintiff's June 21 and June 28, 2007, visits.  Additionally, it refers to Plaintiff's pregnancy, which was in 2007.  Clearly, the August 18, 2009, date is the date when the exhibit was printed and not the date the individual records were generated.

following diagnoses: lumbar disc disease, lumbar radiculopathy, and lumbar facet arthropathy. Furthermore [she] has a recent diagnosis of pregnancy which may preclude her from taking her usual pain medications. This will most likely increase her overall pain levels and decrease functionality. Although [she] has normal strength and is able to ambulate without problems, walking long distances does increase her pain levels.

(Id. at 874.)

Pursuant to prior applications of Plaintiff for benefits, she was examined by Steven E. Gerson, D.O., of Henderson, Nevada, on September 11, 2007. (Id. at 392-99.) She reported that her low back pain of fifteen years' duration had worsened in 2005 when she lifted up her four-year old child. (Id. at 392.) The constant pain radiated to the right leg and, to a lesser degree, to the left. (Id.) Also, her legs were numb. (Id.) Her pain was aggravated by bending, sitting, standing, and walking; it was alleviated by rest. (Id.) At the time, she was eighteen weeks pregnant. (Id.) Medication she had previously taken, i.e., oxycodone and a Fentanyl patch, had provided mild relief of her symptoms. (Id. at 392-93.) She had difficulty with lifting and carrying. (Id. at 393.) She had muscle pain and, occasionally, muscle spasms. (Id.) Her back pain was a ten out of ten at its worst; currently, it was seven. (Id.) Due to gastric bypass surgery, her weight had decreased from 273 pounds to 134 pounds. (Id.) Currently, her weight was 172 pounds. (Id. at 394.) On examination, her back had midline thoracic and lumbar spinal tenderness and paravertebral tenderness. (Id.) She could forward flex to seventy degrees and retroflex to twenty. (Id.) Her other ranges of motion were normal. (Id.) She had paralumbar muscle spasms. (Id.) Straight leg raises were negative on the left and positive on the right. (Id.) She walked slowly and with a mild to moderate limp. (Id. at 395.) She had severe difficulties walking on her toes and heels and

with squatting and rising.  (Id.)  She had moderate difficulties getting on and off the examining table and with tandem walking.  (Id.)  She did not need or use an assistive device. (Id.)  Her sensation to the lateral aspect of her left leg had decreased and had increased to pinprick of the right leg.  (Id.)  Similarly, vibration sense was decreased on the left and increased on the right.  (Id.)  She was oriented to time, place, and person.  (Id.)  She had intact judgment, concentration, and short term and long term memory.  (Id.)  She was tender in her right shoulder.  (Id.)  She had a "weakly positive" Patrick's sign in her right hip, which was limited in its range of motion to thirty degrees on backward extension, forty degrees on internal rotation, fifty degrees on external rotation, forty degrees on abduction, and twenty degrees on adduction.  (Id.)  Dr. Gerson's diagnosis was disc disease of the back.  (Id.)  He opined that this disease limited Plaintiff to lifting or carrying twenty pounds occasionally and ten pounds frequently, to standing or walking up to six hours in an eight-hour workday, and to sitting for six hours or more in an eight-hour workday.  (Id. at 396.)  She needed an alternate sitting and standing option.  (Id.)  She should only occasionally kneel, balance, and climb ramps, stairs, ladders, and scaffolds.  (Id.)  She should never stoop, bend, crouch, squat, or crawl.  (Id.)  She had only one environmental restriction, i.e., she should only occasionally be around moving machinery.  (Id. at 397.)  Dr. Gerson observed that Plaintiff was "several times able to point out various pathologies by moving and rotating both hands and arms in many directions without any obvious pain or distress noted."  (Id.)

In September 2009, a Psychiatric Review Technique form (PRTF) was completed for Plaintiff by a non-examining consultant, Kyle DeVore, Ph.D.  (Id. at 996-1006.)  Plaintiff was assessed as having no medically determinable mental impairment.  (Id. at 996.)

The same month, a Physical Residual Functional Capacity Assessment (PRFCA) of Plaintiff was completed by Nola Townley, a single decision-maker.[33]  (Id. at 63-68.)  The primary diagnosis was spondylolsis; the secondary diagnosis was disc herniation.  (Id. at 63.)  These impairments resulted in exertional limitations of Plaintiff being able to occasionally lift or carry fifty pounds; frequently lift or carry twenty-five pounds; and, stand, walk, or sit for approximately six hours in an eight-hour day.  (Id. at 64.)  Her ability to push or pull was otherwise unlimited.  (Id.)  She had no postural, manipulative, visual, or communicative limitations.  (Id. at 64-65.)  She had environmental limitations of needing to avoid concentrated exposure to extreme cold or vibrations.  (Id. at 66.)

In February 2010, see page 25, supra, Dr. Metzler completed a Residual Functional Capacity Questionnaire.  (Id. at 1014-16, 1088-89.)  Since Plaintiff's first visit to him in October 2005, he had seen her three times a year.  (Id. at 1088.)  Her symptoms included fatigue, drowsiness, and leg and low back pain.  (Id.)  He opined that her symptoms were frequently severe enough to interfere with the attention and concentration required to perform simple, work-related tasks.  (Id. at 1014.)  She would need to lie down in excess of the normal breaks allowed during a typical eight-hour work day.  (Id.)  She could not walk farther

---

[33]See 20 C.F.R. §§ 404.906, 416.1406 (defining role of single decision-maker under proposed modifications to disability determination procedures).  See also **Shackleford v. Astrue**, 2012 WL 918864, *3 n.3 (E.D. Mo. Mar. 19, 2012) ("Single decision-makers are disability examiners authorized to adjudicate cases without mandatory concurrence by a physician.") (citation omitted).

than one-half city block due to her impairments.  (Id.)  Also, due to her impairments, she could not sit for longer than thirty minutes at one time and for longer than a total of one hour during a typical eight-hour work day, nor could she stand or walk for longer than fifteen minutes at one time.  (Id.)  She would need a sit/stand option.  (Id.)  She could occasionally lift less than ten pounds.  (Id. at 1015.)  And, she was likely to be absent from work more than four times a month as a result of her impairments and the necessary treatments.  (Id.)  Plaintiff was not a malingerer.  (Id.)  Plaintiff has had her disabling impairments since 2007.  (Id. at 1016.)

## The ALJ's Decision

The ALJ first determined that Plaintiff had met the insured status requirements of the Act through March 31, 2009, and had not engaged in substantial gainful activity since her alleged onset date of March 22, 2005.  (Id. at 14.)  The ALJ next found that Plaintiff had severe impairments of disorders of the back including spondylosis[34] at L5-S1; post-lumbar fusion; disc bulge at L3-S1; and chronic pain.  (Id.)  These impairments did not, however, meet or medically equal an impairment of listing-level severity.  (Id. at 15.)

Summarizing Plaintiff's medical records, the ALJ noted that imaging studies, e.g., x-rays and MRIs, revealed only mild problems or small irregularities, e.g., a March 2005 x-ray showed a mild flattening of the thecal sac and a March 2006 MRI showed mild generalized

_____

[34]Spondylosis is the "ankylosis of a vertebral joint [or] degenerative changes due to osteoarthritis."  Dorland's at 1754.  Ankylosis is defined as "immobility and consolidation of a joint due to disease, injury, or surgical procedure."  Id. at 94.  Although it is not the same condition as the spondylolsis with which Plaintiff was diagnosed, the ALJ's error is not of significance.  See **Collins v. Astrue**, 648 F.3d 869, 872 (8th Cir. 2011) (deficiency in opinion writing that has no bearing on outcome of the case does not require reversal and remand).

disc bulging, while Plaintiff complained of pain but reported no difficulties with activities of daily living.  (Id. at 16.)  He further noted that Plaintiff's "self-report[ed]" worsening pain was inconsistent with her physicians' findings, e.g., Dr. Coppel's description of her gait as normal and the generally negative results on straight leg raises, and with the conservative treatment until mid-2008.  (Id. at 17.)  In late 2008, the conservative treatment was no longer effective, resulting in Plaintiff undergoing surgery in February 2009.  (Id.)  She was described after that surgery has having no limitations in her activities of daily living; her pain was described as "much improved."  (Id. at 18.)  In April 2009, her gait was mildly antalgic; but again, she was not limited in her activities of daily living.  (Id.)

Discussing Dr. Metzler's opinion of February 2010, the ALJ declined to give it great weight, finding it to be based on Plaintiff's subjective complaints.  (Id. at 19.)

The ALJ also declined to find Plaintiff fully credible.  (Id.)  He noted and considered the relevant factors under Polaski v. Heckler, 739 F.2d 1320, 322 (8th Cir. 1984), and concluded that she was not as limited as she had testified.  (Id.)

She had, the ALJ found, the RFC to perform light work[35] as defined in the regulations with the exception of occasionally stooping, kneeling, crouching, and climbing stairs and ramps and never crawling or climbing ropes or scaffolds.  (Id. at 15.)  Also, she needed a sit/stand option and should avoid concentrated exposure to extreme cold and heat.  (Id.)

---

[35]"Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds."  20 C.F.R. § 404.1567(b).

With her RFC, she could perform her past relevant work as a cashier, billing clerk, customer service representative, and dispatcher.  (Id. at 20.)  She was not, therefore, disabled within the meaning of the Act.  (Id.)

## Legal Standards

Under the Act, the Commissioner shall find a person disabled if the claimant is "unable to engage in any substantial activity by reason of any medically determinable physical or mental impairment," which must last for a continuous period of at least twelve months or be expected to result in death.  42 U.S.C. § 1382c(a)(3)(A).  Not only the impairment, but the inability to work caused by the impairment must last, or be expected to last, not less than twelve months.  **Barnhart v. Walton**, 535 U.S. 212, 217-18 (2002). Additionally, the impairment suffered must be "of such severity that [the claimant] is not only unable to do [her] previous work, but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether . . . a specific job vacancy exists for [her], or whether [s]he would be hired if [s]he applied for work."  42 U.S.C. § 1382c(a)(3)(B).

The Commissioner has established a five-step process for determining whether a person is disabled.  See 20 C.F.R. §§ 404.1520, 416.920; **Hurd v. Astrue**, 621 F.3d 734, 738 (8th Cir. 2010); **Gragg v. Astrue**, 615 F.3d 932, 937 (8th Cir. 2010); **Moore v. Astrue**, 572 F.3d 520, 523 (8th Cir. 2009).  "Each step in the disability determination entails a separate analysis and legal standard."  **Lacroix v. Barnhart**, 465 F.3d 881, 888 (8th Cir. 2006).  First, the claimant cannot be presently engaged in "substantial gainful activity."  See 20 C.F.R.

§§ 404.1520(b), 416.920(b); **Hurd**, 621 F.3d at 738. Second, the claimant must have a severe impairment. See 20 C.F.R. §§ 404.1520(c), 416.1520(c). The Act defines "severe impairment" as "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities . . . ." Id.

At the third step in the sequential evaluation process, the ALJ must determine whether the claimant has a severe impairment which meets or equals one of the impairments listed in the regulations and whether such impairment meets the twelve-month durational requirement. See 20 C.F.R. §§ 404.1520(d), 416.920(d) and Part 404, Subpart P, Appendix 1. If the claimant meets these requirements, she is presumed to be disabled and is entitled to benefits. **Warren v. Shalala**, 29 F.3d 1287, 1290 (8th Cir. 1994).

"Prior to step four, the ALJ must assess the claimant's [RFC], which is the most a claimant can do despite her limitations." **Moore**, 572 F.3d at 523 (citing 20 C.F.R. § 404.1545(a)(1)). "[RFC] is not the ability merely to lift weights occasionally in a doctor's office; it is the ability to perform the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world." **Ingram v. Chater**, 107 F.3d 598, 604 (8th Cir. 1997) (internal quotations omitted). Moreover, "'a claimant's RFC [is] based on all relevant evidence, including the medical records, observations by treating physicians and others, and an individual's own description of his limitations.'" **Moore**, 572 F.3d at 523 (quoting Lacroix, 465 F.3d at 887); accord **Partee v. Astrue**, 638 F.3d 860, 865 (8th Cir. 2011).

In determining a claimant's RFC, "'the ALJ first must evaluate the claimant's credibility.'" **Wagner v. Astrue**, 499 F.3d 842, 851 (8th Cir. 2007) (quoting <u>Pearsall v. Massanari</u>, 274 F.3d 1211, 1217 (8th Cir. 2002)). This evaluation requires that the ALJ consider "'[1] the claimant's daily activities; [2] the duration, frequency and intensity of the pain; [3] precipitating and aggravating factors; [4] dosage, effectiveness and side effects of medication; [5] functional restrictions.'" **Id.** (quoting <u>Polaski</u>, 739 F.2d at 1322). "The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts.'" **Id.** (quoting <u>Pearsall</u>, 274 F.3d at 1218). After considering the <u>Polaski</u> factors, the ALJ must make express credibility determinations and set forth the inconsistencies in the record which caused the ALJ to reject the claimant's complaints. **Singh v. Apfel**, 222 F.3d 448, 452 (8th Cir. 2000); **Beckley v. Apfel**, 152 F.3d 1056, 1059 (8th Cir. 1998).

At step four, the ALJ determines whether claimant can return to her past relevant work, "review[ing] [the claimant's] [RFC] and the physical and mental demands of the work [claimant has] done in the past." 20 C.F.R. §§ 404.1520(e), 416.920(e). Additionally, "[a]n ALJ may find the claimant able to perform past relevant work if the claimant retains the ability to perform the functional requirements of the job as she actually performed it or as generally required by employers in the national economy." **Samons v. Astrue**, 497 F.3d 813, 821 (8th Cir. 2007). The burden at step four remains with the claimant to prove her RFC and establish that she cannot return to her past relevant work. **Moore**, 572 F.3d at 523; <u>accord</u> **Dukes v. Barnhart**, 436 F.3d 923, 928 (8th Cir. 2006); **Vandenboom v. Barnhart**, 421 F.3d 745, 750 (8th Cir. 2005).

If the ALJ holds at step four of the process that a claimant cannot return to her past relevant work, the burden shifts at step five to the Commissioner to establish that the claimant maintains the RFC to perform a significant number of jobs within the national economy. **Pate-Fires v. Astrue**, 564 F.3d 935, 942 (8th Cir. 2009); **Banks v. Massanari**, 258 F.3d 820, 824 (8th Cir. 2001). <u>See</u> <u>also</u> 20 C.F.R. §§ 404.1520(f), 416.920(f).

If the claimant is prevented by her impairment from doing any other work, the ALJ will find the claimant to be disabled.

The ALJ's decision whether a person is disabled under the standards set forth above is conclusive upon this Court "'if it is supported by substantial evidence on the record as a whole.'" **Wiese v. Astrue**, 552 F.3d 728, 730 (8th Cir. 2009) (quoting <u>Finch v. Astrue</u>, 547 F.3d 933, 935 (8th Cir. 2008)); <u>accord</u> **Dunahoo v. Apfel**, 241 F.3d 1033, 1037 (8th Cir. 2001). "'Substantial evidence is relevant evidence that a reasonable mind would accept as adequate to support the Commissioner's conclusion.'" **Partee**, 638 F.3d at 863 (quoting <u>Goff</u> <u>v. Barnhart</u>, 421 F.3d 785, 789 (8th Cir. 2005)). When reviewing the record to determine whether the Commissioner's decision is supported by substantial evidence, however, the Court must consider evidence that supports the decision and evidence that fairly detracts from that decision. **Moore**, 623 F.3d at 602; **Jones v. Astrue**, 619 F.3d 963, 968 (8th Cir. 2010); **Finch**, 547 F.3d at 935. The Court may not reverse that decision merely because substantial evidence would also support an opposite conclusion, **Dunahoo**, 241 F.3d at 1037, or it might have "come to a different conclusion," **Wiese**, 552 F.3d at 730. "'If after reviewing the record, the [C]ourt finds it is possible to draw two inconsistent positions from the evidence

and one of those positions represents the ALJ's findings, the [C]ourt must affirm the ALJ's decision.'" **Partee**, 638 F.3d at 863 (quoting Goff, 421 F.3d at 789). See also **Owen v. Astrue**, 551 F.3d 792, 798 (8th Cir. 2008) (the ALJ's denial of benefits is not to be reversed "so long as the ALJ's decision falls within the available zone of choice") (internal quotations omitted).

### Discussion

Plaintiff argues that the ALJ erred by (1) not basing his RFC findings on the medical evidence, specifically, the opinion of Dr. Metzler, and (2) not including the concrete consequences of her impairments, specifically, the consequences found by Dr. Metzler, in the hypothetical question posed to the VE.

After reviewing the record, including Plaintiff's medical records, and assessing her credibility,[36] the ALJ determined that she had the RFC to perform light work with the exceptions of (a) occasionally stooping, kneeling, crouching, and climbing stairs and ramps; (b) never crawling or climbing ropes or scaffolds; (c) avoiding concentrated exposure to extreme cold and heat; and (d) requiring a sit/stand option. On the other hand, Dr. Metzler opined that Plaintiff (i) could not perform simple, work-related tasks because of her symptoms; (ii) needed to lie down in excess of the normal breaks allowed during a typical eight-hour work day; (iii) could not walk farther than one-half city block to her impairments; (iv) could not sit for longer than thirty minutes at one time and for longer than a total of one hour during a typical eight-hour work day; (v) could not stand or walk for longer than fifteen

_____

[36]The Court notes that Plaintiff does not challenge the ALJ's assessment of her credibility.

minutes at one time; (vi) needed a sit/stand option; (vii) could not lift anything ten pounds or heavier, even occasionally; and (viii) was likely to be absent from more than four times a month as a result of her impairments and the necessary treatments.

"The RFC 'is a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities,' despite his or her physical or mental limitations." **Roberson v. Astrue**, 481 F.3d 1020, 1023 (8th Cir. 2007) (quoting SSR 96-8p, 1996 WL 374184, at *3 (S.S.A. July 2, 1996)); accord **Masterson v. Barnhart**, 363 F.3d 731, 737 (8th Cir. 2004); **Depover v. Barnhart**, 349 F.3d 563, 567 (8th Cir. 2003). "When determining a claimant's RFC, the ALJ must consider all relevant evidence, including the claimant's own description of her or his limitations, as well as medical records, and observations of treating physicians and others." **Roberson**, 481 F.3d at 1023. Plaintiff argues that the ALJ erred in his RFC findings by not giving the assessment of her treating physician, Dr. Metzler, controlling weight.

"A treating physician's opinion is given controlling weight if it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [a claimant's] case record.'" **Tilley v. Astrue**, 580 F.3d 675, 679 (8th Cir. 2009) (quoting 20 C.F.R. § 404.1527(d)(2)[37]) (alteration in original); accord **Halverson v. Astrue**, 600 F.3d 922, 929 (8th Cir. 2010); **Davidson v. Astrue**, 578 F.3d 838, 842 (8th Cir. 2009). "[W]hile a treating physician's opinion is generally entitled to substantial weight, such an opinion does not automatically control because the [ALJ] must evaluate the

---

[37]See note 38, infra.

record as a whole." **Wagner**, 499 F.3d at 849 (internal quotations omitted).  Thus, "'an ALJ may grant less weight to a treating physician's opinion when that opinion conflicts with other substantial medical evidence contained within the record.'" **Id.** (quoting Prosch v. Apfel, 201 F.3d 1010, 1013-14 (8th Cir.2000)).  Also relevant are the length of the treatment relationship, the frequency of examinations, supportability, consistency, and specialization of the treating physician.  See 20 C.F.R. §§ 404.1527(d)(2)(i), (3), (4), and (5); 416.927(d)(2)(i), (3), (4), and (5).[38]

Plaintiff contends that Dr. Metzler's assessment of her RFC is supported by imaging studies.  It is not.  An MRI of her lumbar spine taken six days after her alleged disability onset date revealed a *small* left paracentral and central disc herniation at L4-L5, a *small* central disc protrusion at L4-L, *no* significant spinal stenosis, and *no* foraminal narrowing.  The next MRI was performed in May 2006, revealing *minimal to mild* generalized disc bulging at L3-L4, L4-L5, and L5-S1.  In May 2007, when she first consulted a physician after relocating to Nevada, the physician, Dr. Coppel, decided that no imaging or diagnostic studies were needed.  In March 2008, an MRI revealed *mild* bulging at L4-L5 and L5-S1, ligamentum flavum redundancy and arthropathy at L4-L5, and asymmetric fatty tissue at L3.  The findings of a CT scan performed two months were also described with adjectives of "minimal" or

---

[38]Citations to 20 C.F.R. §§ 404.1527 and 416.927 are to the 2010 version of the Regulations in effect when the ALJ rendered his adverse decision. The Regulations's most recent amendment, effective March 26, 2012, reorganizes the relevant subparagraphs but does not change their substance.

"slight."  No further imaging studies were performed before Dr. Metzler rendered his assessment.

Nor is Dr. Metzler's assessment clearly supported by diagnostic studies.  In June 2009, when she saw him again after returning to Missouri, she had pain with attempts at lumbar flexion and weakness with bilateral great toe extension, but full strength with bilateral knee and hip flexion and bilateral dorsiflexion.  Two months earlier, she had twice told Dr. Lee that her pain was "much improved."  (R. at 812, 813.)  One month earlier, she had told Dr. Coppel that her symptoms were "fairly well controlled with her current medication regimen."  (Id. at 993.)  On some examinations, she had a normal gait and stance and negative straight leg raises.  (See Id. at 297-99, 317, 319, 388.)  On others, she walked with an antalgic gait and had positive straight leg raises.  (See Id. at 262, 329, 744-45.)

Plaintiff also contends that the length of her treatment relationship with Dr. Metzler favors giving his assessment controlling weight, contrary to the ALJ's observation about the time she was in Nevada.  As noted by Dr. Metzler, he first saw Plaintiff in October 2005.  He examined her at this visit.  The next four visits were for the administration of transforaminal epidural steroid injections.  There are no reported examination findings.  At the next visit, in May 2006, Plaintiff consulted Dr. Metzler about pain at the injection site.  There was a small hematoma at the site, but no infection.  She also inquired about a surgical evaluation of her lumbar pain.  The subsequent consultations, one in April 2007 and one in May 2007, were for renewals of prescriptions.  There are no reported examination findings from these visits.  Two years later, in June 2009, Plaintiff next saw Dr. Metzler.  He renewed the prescriptions

for medications she had been on when in Nevada and suggested she follow-up with a spine surgeon for evaluation of her status of her spinal fusion. He saw her again the following October, but did not conduct an examination. The next time he examined Plaintiff was in February 2010, when he also completed the Residual Functional Capacity Questionnaire on her behalf. Thus, contrary to his representation on that questionnaire, Dr. Metzler had not seen her three times a year since October 2005. Rather, he had seen her eight times between October 2005 and May 2007 and three times between June 2009 and February 2010. Of the first group, only two of the eight visits included an examination. Of the second group, only two of the three included an examination, and the second of these was conducted when he completed the questionnaire. Moreover, Dr. Metzler opined in his response to that questionnaire that Plaintiff had been disabled since 2007. He had, however, not examined her in 2007. Indeed, after his May 2006 examination of Plaintiff, his next was in June 2009. Thus, the length and nature of Dr. Metzler's treatment relationship with Plaintiff does not favor her position. <u>See</u> **Martise v. Astrue**, 641 F.3d 909, 925 (8th Cir. 2011) ("'When deciding how much weight to give a treating physician's opinion, an ALJ must . . . consider the length of the treatment relationship and the frequency of examinations.'") (quoting <u>Brown v. Astrue</u>, 611 F.3d 941, 951 (8th Cir. 2011)).

Also detracting from the weight to be given Dr. Metzler's assessment is its clear reliance on Plaintiff's complaints. Plaintiff reported to him when first seeing him after her spinal fusion and after returning to Missouri that her back pain and leg symptoms had improved, but had not completely resolved. When she was next examined, she reported not

being able to stand or sit for long and having to frequently change positions. There are no examination findings supporting these restrictions, which were incorporated by Dr. Metzler in his assessment. It was not error for the ALJ to disregard limitations based on Plaintiff's subjective complaints rather than on Dr. Metzler's examination findings. See **Teague v. Astrue**, 638 F.3d 611, 616 (8th Cir. 2011) (finding no error in ALJ's decision discounting doctor's report based on claimant's subjective complaints rather than on doctor's own findings). See also **McCoy v. Astrue**, 648 F.3d 605, 617 (8th Cir. 2011) (rejecting claimant's challenge to lack of weight given treating physician's evaluation of claimant's mental impairments when "evaluation appeared to be based, at least in part, on [claimant's] self-reported symptoms and, thus, insofar as those reported symptoms were found to be less than credible, [the treating physician's] report was rendered less credible"); **Kirby v. Astrue**, 500 F.3d 705, 709 (8th Cir. 2007) (finding that ALJ was entitled to discount treating physician's statement as to claimant's limitations because such conclusion was based primarily on claimant's subjective complaints and not on objective medical evidence).

Plaintiff further argues that the ALJ erred by finding her ability to drive, do housework, cook, and go to the grocery store reflected an improvement in her condition following her February 2009 surgery and that these limited activities do not reflect an ability to engage in full-time competitive employment. Plaintiff's argument is unavailing for two reasons. First, the reference at issue was made in the context of the ALJ evaluating her credibility, an evaluation which Plaintiff does not challenge. Second, although "a claimant 'need not be bedridden in order to be unable to work,'" **Wagner**, 499 F.3d at 851 (quoting

Roberson, 481 F.3d at 1025, as noted by the Commissioner, Plaintiff's daily activities were clearly more strenuous than the activities cited by the ALJ. According to the testimony and the documentary record, Plaintiff was at home with a two-year old toddler weighing at least twenty-five pounds while her two older children were at school and her mother-in-law and husband were at work.

Plaintiff next takes issue with the omission from the hypothetical question to the VE of limitations described by Dr. Metzler in his assessment. "'The ALJ's hypothetical question to the [VE] needs to include only those impairments that the ALJ finds are substantially supported by the record as a whole.'" **Renstrom v. Astrue**, 680 F.3d 1057, 1067 (8th Cir. 2012) (quoting Martise, 641 F.3d at 927). The question need not incorporate additional limitations properly disregarded by the ALJ. **Id.** Such limitations may include those based on a claimant's discounted subjective complaints and those based on medical opinions that the ALJ has not given controlling weight. **Id.** Accord **Perkins v. Astrue**, 648 F.3d 892, 902 (8th Cir. 2011); **Heino v. Astrue**, 578 F.3d 873, 882 (8th Cir. 2009). In the instant case, the ALJ posed a hypothetical question to the VE that encompassed the concrete consequences of the impairments he found to be supported by substantial evidence on the record as a whole. The question was, therefore, proper.

### Conclusion

Considering all the evidence in the record, including that which detracts from the ALJ's conclusions, the Court finds that there is substantial evidence to support the ALJ's decision. "If substantial evidence supports the ALJ's decision, [the Court] [should] not reverse the

decision merely because substantial evidence would have also supported a contrary outcome, or because [the Court] would have decided differently." **Wildman v. Astrue**, 596 F.3d 959, 964 (8th Cir. 2010).  Accordingly, for the foregoing reasons,

**IT IS HEREBY RECOMMENDED** that the decision of the Commissioner be AFFIRMED and that this case be DISMISSED.

The parties are advised that they have **fourteen days** in which to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in waiver of the right to appeal questions of fact.

/s/ Thomas C. Mummert, III
THOMAS C. MUMMERT, III
UNITED STATES MAGISTRATE JUDGE

Dated this  10th  day of June, 2013.